C.R. McReynolds SBN 220878
LAW OFFICE OF C.R. McREYNOLDS
2396 Pickens Canyon Road
La Crescenta, CA 91214
Tel: (818) 454-3413
Fax: (818) 276-8453
E-mail: ~~mcreynoldslaw@hotmail.com~~

Attorney for Defendant
KYLE CARRIERE

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>KYLE CARRIERE, et. al.,<br><br>  Defendants. | CASE NO. 10-952-CAS<br><br>**DEFENDANT KYLE CARRIERE'S SENTENCING MEMORANDUM** |

Defendant KYLE CARRIERE, by and through his counsel of record, Law Office of C.R. McReynolds, hereby submits the defense position with respect to sentencing. It is the defense position that the offense level should be calculated at 28 for the reasons set forth herein. The defense requests that this Court grant a two level downward departure for sentence factor manipulation as detailed herein. The defense does not challenge the imposition of a two level increase pursuant to United States Sentencing Guidelines (hereinafter "U.S.S.G.") §2D1.1(b)(1) and further agrees with the criminal history calculation in the Presentence Report ("PSR") placing

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

1

Defendant Carriere in category I. Accordingly, the defense asks the Court to impose a sentence based on the adjusted offense level of 28 at the low end of the guideline range of 78 months.

Respectfully Submitted,

Dated: March 19, 2012

C.R. McReynolds
Attorney for Defendant
KYLE CARRIERE

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

2

# I.
# INTRODUCTION

On November 28, 2011, Defendant Kyle Carriere pleaded guilty to a single count of a violation of 21 U.S.C. § 846, conspiracy and attempt to distribute controlled substances. As part of the plea, the defendant admitted to involvement in MDMA transactions of a total of 741.5 grams. The defendant further admitted that he intended to deliver 8,000 pieces of candy to a government agent who had requested 8,000 MDMA pills.

The defense contends that the MDMA Guideline calculation grossly overstates the equivalency calculation for converting MDMA to marijuana and that the inclusion of the 8,000 candy pills along with the less than 2,000 pills actually sold by the defendant is improper and will result in an unjust sentence.

# II.
# CALCULATION OF THE BASE OFFENSE LEVEL

A. **History**

Prior to 2001, the Guidelines held that one gram of MDMA was equivalent to 35 grams of marijuana. United States Sentencing Commission, Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments ("Ecstasy Report") 6 (2001). In 2000, Congress passed the Ecstasy Anti-Proliferation Act, which directed the Commission to review and increase penalties for any offense relating to the manufacture and trafficking of MDMA, and required the Commission to submit a report on the resulting amendments to Congress. Pub. L. No. 106-310, 114 Stat. 1101, 1241-45. The Commission established an MDMA-to-marijuana equivalency of 1:500. The Commission cited the following reasons for imposing higher sentences for MDMA offenses than for powder cocaine: "(1) unlike MDMA, powder cocaine is not neurotoxic, (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA, and (3) powder cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen." Ecstasy Report 5.

B. **Applicable Law**

The Sentencing Guidelines are "advisory." *United States v. Booker,* 543 U.S. 220, 244-45 (2005). A district court is free to determine that the Guidelines are not based on empirical data and

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

3

national experience and do not exemplify the Commission's exercise of its characteristic institutional role. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). This determination may be based on a finding that the Guidelines "rest [] on assumptions about…relative harmfulness…that more recent research and data no longer support." *Kimbrough*, 522 U.S. at 98.

Under *Kimbrough*, this Court has discretion to vary from Guidelines that lack an empirical basis. The MDMA Guideline, adopted more than ten years ago, is based on since repudiated scientific support, including conclusions by the Sentencing Commission that MDMA is highly neurotoxic (i.e., tending to cause cell death) and is more harmful than cocaine. Because of the serious flaws of the MDMA Guideline, this Court should exercise such discretion here in order to avoid a grave injustice by adding unnecessary years onto a sentence based on long-discredited myths about the harmfulness of the offense. Like the crack cocaine Guideline at issue in *Kimbrough*, the MDMA Guideline is scientifically unsupportable and results in sentencing ranges that are unfairly severe.

Federal courts have applied the principles of *Kimbrough* for policy-based departures from Guidelines for drugs other than crack. *See, e.g., United States v. Valdez*, 268 Fed. App'x 293, 297 (5th Cir. 2008) (mem.) (methamphetamine); *United States v. Goodman*, 556 F. Supp. 2d 1002, 1010-11, 1016 (D. Neb. 2008) (same); *United States v. Thomas*, 595 F.Supp2d 949, 952 (E.D. Wis. 2009) (powder cocaine). Moreover, the Supreme Court has implied that its reasoning in *Kimbrough* could apply to any drug Guidelines, since "the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes." *Gall v. United States*, 552 U.S. 38, 46 n. 2 (2007). Appellate and sentencing courts have recognized that district courts have authority to depart from any Guideline that was not based on reasoned, empirical evidence. See *United States v. Cavera*, 550 F.3d 180, 184 (2nd Cir. 2008) (en banc) (arms trafficking); see also *United States v. Herrera-Zuniga*, 571 F.3d 568, 583, 586 (6th Cir. 2009) (illegal reentry); *United States v. Vanvliet*, 542 F.3d 259 (1st Cir. 2008) (interstate travel with the intent to engage in an illicit sexual act); *United States v. Baird*, 580 F.Supp. 2d 889, 894-95 (D. Neb. 2008) (child pornography).

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

4

### C. Development of the MDMA Guideline

The MDMA Guideline is not based on empirical evidence but rather erroneous and now-discredited beliefs about the harmfulness of MDMA. Like the crack cocaine Guideline that was the subject of *Kimbrough*, the MDMA Guideline was developed in response to a congressional directive. The development of both Guidelines occurred in the midst of emotional public frenzies over new drugs. The Commission formulated the penalty increase with respect to MDMA by making policy judgments about the comparative harmfulness of cocaine, MDMA, and heroin, and concluding that the harmfulness of MDMA fell somewhere in between the harmfulness of cocaine and heroin. Ecstasy Report.

#### 1. Neurotoxicity of MDMA

The Commission relied heavily upon a highly publicized study by Dr. George Ricaurte which appeared to demonstrate MDMA-induced neurotoxicity. However, in 2003 *Science* magazine issued a retraction of one of Ricaurte's MDMA studies which purported to show that a single dose of MDMA could cause brain injury. Donald J. McNeil Jr. *Research on Ecstasy Is Clouded By Errors*, N.Y. Times, Dec. 2, 2003 at F1. Scientists named by Ricaurte in defense of his work admitted that "some of his best-known work has nonetheless been 'sloppy' or 'not as methodologically rigorous as you might want." *Id.*

Recent research has found no significant evidence of neurotoxicity. Ronald L. Cowan et. al., *Occipital Cortical Proton MRS at 4 Tesla in Human Moderate MDMA Polydrug Users*, 155(3) Psychiatry Res. 179 (2007; de Win et. al., *A Prospective Cohort Study on Sustained Effects of Low-Dose Ecstasy Use on the Brain in New Ecstasy Users*, 32 Neuropsychopharmacology 458 (2007). Several animal studies using moderate dosage levels have found no evidence of neurotoxicity. Fantegrossi et. al., *Behavioral and Neurochemical Consequences of Long-term Intravenous Self-Administration of MDMA and its Enantiomers by Rhesus Monkeys*, 29 Neuropsychopharmacology 1270 (2004); Wang et. al., *Methylenedioxmethamphetamine Administration to Rats Does Not Decrease Levels of the Serotonin Transporter Protein or Alter its Distribution Between Endosomes and the Plasma Membrane*, 314 J. Pharmacol. Exp. Ther. 1002 (2005). Accordingly, the

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

5

Commission's unsubstantiated conclusion about the neurotoxicity of MDMA should not now form the basis for severe sentences for MDMA offenders.

### 2. Relative Harmfulness of MDMA

The Commission also predicated its findings on the conclusion that MDMA is more harmful than cocaine, thereby setting the MDMA equivalency at 2.5 times the amount for powder cocaine. This finding was based upon the neurotoxicity factor addressed above, as well as the relative threat posed to youth and the belief that MDMA, unlike cocaine, is both a stimulant and a hallucinogen.

National experience has shown that MDMA does not pose a greater risk to the nation's youth than cocaine. In 2006, the number of cocaine-related emergency room visits was nearly two-and-a-half times the number of MDMA-related visits for youths aged thirteen to seventeen. For person aged eighteen to twenty, the number of cocaine-related visits was almost seven times higher than MDMA-related visits. Drug Abuse Warning Network, *National Estimates of Drug-Related Emergency Department Visits* 23 (2006).

Cocaine is the leading cause of drug-related visits to emergency rooms, while MDMA leads to less than 1% of drug-related visits. In 2006, there were more than thirty-two times as many cocaine-related visits as MDMA-related visits. *Id.* 19-20. Twice as many people are hospitalized annually because of adverse reactions to acetaminophen (the active ingredient in Tylenol) as MDMA ingestion. *Ban is Advised on Top Two Pills for Pain Relief*, N.Y. Times, Jul. 1, 2009 at A1.

In a comparison of the relative harmfulness of illicit drugs, a British medical journal determined MDMA ranked eighteenth most dangerous out of the twenty drugs studied. Heroin and cocaine ranked first and second respectively, while marijuana ranked eleventh. David Nutt et. al., *Development of a Rational Scale to Assess the Harm of Drugs of Potential Misuse*, 369 THE LANCET 1047, 1049-50 (2007).

### 3. Hallucinogenic Properties of MDMA

The final factor relied upon by the Commission was the hallucinogenic properties of MDMA. However, the scientific properties and categorization of MDMA and cocaine respectively do not relate to the drugs' relative degree of harmfulness. The Commission's statement that cocaine is only a stimulant, while MDMA is both a stimulant and a hallucinogen, is without factual support and

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

6

largely irrelevant. See *United States v. McCarthy*, 09-CR-1136 (WHP), Memorandum and Order 5/19/11 (S.D.N.Y.). This is therefore not a reason to treat MDMA offenders more harshly than cocaine offenders.

### D. Recent Treatment of the MDMA Guideline

Recent scientific understanding reveals that the Commission seriously overestimated the harmfulness of MDMA at a time when little was known about the substance. Because the MDMA Guideline resulted from unsubstantiated fears and flawed research, the sentences recommended by the Guideline do not approximate sentences that are tailored achieve the sentencing objectives of 18 U.S.C. §3553(a). The intervening years have demonstrated that MDMA is less harmful than the Commission and Congress predicted and the sentencing ranges are unduly severe. To avoid this injustice, this Court should exercise its discretion under *Kimbrough* to vary from the scientifically-flawed and unnecessarily harsh MDMA Guideline.

The issue raised herein was addressed directly in the case of *United States v. McCarthy*, 09-CR-1136 (WHP) (S.D.N.Y.) and resolved in a Memorandum and Order dated May 19, 2011. In that case, the Court considered the same scientific studies cited herein. The Court also heard testimony from multiple experts called by both the defense and the prosecution. In ruling, the Court was mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553. The Court reasoned that this principle would be violated where disparate drug equivalencies are established for similar narcotics based on an incomplete analysis. It determined that the evidence was "overwhelming" that MDMA was not more harmful than cocaine. Nevertheless, that Court adopted an MDMA-to-marijuana equivalency of 200:1, noting that "much of the evidence indicates that MDMA is less harmful than cocaine, suggesting that an even lower equivalency may be appropriate given a sufficient factual foundation in a later case." Order at 8. The defense urges this Court to conduct a similar analysis in order to determine the appropriate equivalency ratio.

///

///

///

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

7

## III.

## PROPOSED DOWNWARD DEPARTURES

All parties agree that Defendant Carriere actually sold 989 tablets containing MDMA to a cooperating source on November 29, 2007, 516 tablets on December 7, 2007, 500 tablets on January 25, 2008, and 500 tablets on June 3, 2008. The total number of tablets actually sold was 2,505 in the four transactions. The total weight was determined to be 741.5 net grams.

Additionally, the parties agree that Defendant Carriere was pulled over by officers from the Fullerton Police Department on October 9, 2008, and found to be in possession of 8,000 "smarties," a small tablet-shaped candy. Over the preceding two days, the defendant had been in discussions with the cooperating source regarding the purchase of 17,000 MDMA pills. The defendant made efforts to obtain this amount, including contacting co-conspirators Paz and Dam. The defendant was unable to obtain the requested amount but agreed to provide 8,000 pills. Unable to actually procure this amount, the defendant substituted candies for narcotics. The deal did not actually take place and no actual controlled substances were found.

Pursuant to U.S.S.G. § 2D1.1 Application Note 12, if an offense involves an agreement to sell a controlled substance, the agreed-upon quantity shall be used to determine the offense level. Application Note 11 provides that each piece of candy should be treated as if it contained 250 mg of MDMA. As a result, this adds an additional 2,004 grams to the total weight. Accordingly, the PSR calculates the total weight from the four actual transactions and the candy incident as 2,745.5 grams.

The defense contends that it is fundamentally unfair to include the 8,000 candy pills because this was a much larger amount than the defendant had been predisposed to sell, and despite his efforts the defendant was simply unable to do a deal of this magnitude. The largest deal that Defendant Carriere had participated in was for less than 1,000 pills, and the average transaction between him and the cooperating source was for 625 pills. It is now known that the defendant's conversations were intercepted via wiretap and that the government was aware of his efforts to obtain the 17,000 pills originally requested and his inability to do so. Accordingly, the cooperating source next tells the defendant that he wants 15,000 pills, then later states that he no longer has the

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

8

money to obtain the 15,000 pills and now wants 8,000 pills. Despite his inability to secure such an amount, Defendant Carriere agrees and substitutes candy for MDMA.

It is clear based upon the circumstances that the defendant was predisposed to sell MDMA in much smaller amounts. It is also clear that the cooperating source, acting as an agent for the government and at the direction of supervising case agents, attempted to induce the defendant to sell as many pills as possible. In fact, the agreed upon amount was not possible, as it exceeded the amount Defendant Carriere could actually obtain. The government now attempts to treat this defendant as if he actually completed the transaction, in effect punishing him for crimes that he could not have committed but that governments agents attempted to induce.

The normal way for defendants to remedy sentencing entrapment is to move for a downward departure pursuant to U.S.S.G. § 2D1.1, in order that the sentencing court may determine the actual amount a defendant was predisposed to sell, and thus consult the corresponding recommendation per the drug quantity table. *United States v. Baker* (9th Cir. 1995) 63 F.3d 1478, cert. denied 116 S.Ct. 824 (1996). The Ninth Circuit has expressly recognized the authority of a sentencing court to depart downward on this basis. *United States v. Stauffer* (9th Cir. 1994) 38 F.3&1103. _.,

"Sentencing entrapment or sentence factor manipulation occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." *Id* at 1106, quoting *United States v. Stuart* (9th Cir. 1991) 923 F.2d 607, 614, cert. denied, 499 U.S. 967 (1991). A finding of sentence factor manipulation by the government may result in the application of a different statutory penalty provision. *United States v. Montoya* (1stCir.1995) 62F.3d1,3. A district court may subtract the amount of drugs tainted by sentencing entrapment from the total quantity of drugs attributable to the defendant. *United States v. Naranjo* (9th Cir. 1995) 52 F.3d 245,246.

Law enforcement agents must not be allowed to structure sting operations in such a way as to maximize the sentences imposed on defendants. In a case where the government has induced a target to sell far more of a controlled substance than had formerly been within his practice or resources, sentencing entrapment applies and a downward departure is authorized. *United States v. Ramirez-Rangel* (9th Cir. 1997) 103 F.3d 1501, 1506; See also *United States v. McClelland* (9th Cir. 1995) 72 F.3d 717, 726; *United States*

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

9

v. *Baker* (9th Cir. 1995) 63 F.3d 1478, 1500; *United States v. Martinez-Villegas* (C.D.Cal. 1998) 993 F.Supp. 766, 776.

As the Ninth Circuit in *Staufer* made clear, an agent's ability to choose the amount negotiated and thus determine the defendant's sentence can only be:

"discouraged and corrected ... if courts also were able to ensure that the government has some reason to believe that defendants are predisposed to engage in a drug deal of the magnitude for which they are prosecuted. Furthermore, courts can ensure that the sentences imposed reflect the defendant's degree of culpability only if they are able to reduce the sentence of defendants who are not predisposed to engage in deals as large as those induced by the government" *United States* v. *Staufer*, supra at 1107-1108, emphasis added.

The defense contends that this defendant was not predisposed to sell narcotics in the amount induced by the government. The government now wishes to add the total amounts in order to calculate an offense level which drastically overstates the defendant's criminal culpability. There is nothing to suggest the type of predisposition to engage in a deal of this magnitude as required by *Staufer*. In fact, all indications are to the contrary. For that reason, the defense requests that the Court make a finding of sentence factor manipulation.

## IV.

## DEFENSE RECOMMENDATION

The Defense proposes that Defendant Carriere be sentenced as follows. First, the Court is asked to find sentence factor manipulation or sentencing entrapment and not include the 8,000 candies in the calculation. Second, based upon the actual amount of MDMA sold, the Guideline range should be determined based upon a weight of 741.5 grams. Third, the Court should employ the equivalency ratio adopted by the *McCarthy* case of 200:1. This leads to 148.3 KG of marijuana, an offense level of 26 (Pursuant to U.S.S.G. § 2D1.1(c)(7), amounts of marijuana between 100 KG and 400 KG correspond to an offense level of 26). Fourth, the Court should apply a two level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), for an adjusted offense level of 28. Fifth, the

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

10

1  Court should determine that this defendant is appropriately designated in Criminal History Category
2  One. Finally, the defense recommends that the Court sentence at the low end of the Guideline range
3  of 78-97 months.

Respectfully Submitted,

Dated: March 19, 2012

_____
C.R. McReynolds
Attorney for Defendant
KYLE CARRIERE

Case Name: U.S.A. v. Carriere, et. al.
Case No.: 10-952-CAS
Sentencing Memorandum

11